[No. 23569. Department One. May 17, 1932.]

HARRIET MEAGHER, *as Administratrix, Respondent,* v. WAGNER TUG BOAT COMPANY, *Appellant.*[1]

[1]Reported in 11 P. (2d) 245.

254

*Stephen V. Carey* and *Henry T. Ivers,* for appellant.

*John J. Kennett* and *Winter S. Martin,* for respondent.

MITCHELL, J.—This action was brought by Harriet Meagher, as administratrix of the estate of her son, George Harold Meagher, to recover damages for his death, which occurred by reason of a fire and the explosion of an air tank on the tugboat Bermuda, owned and in use by the defendant, Wagner Tug Boat Com-

pany. The deceased was less than twenty years of age, and for less than a month had been employed as a seaman on the Bermuda. The defendant has appealed from a judgment on a verdict in favor of the plaintiff.

The substance of the pleadings, with respect to the questions presented on the appeal, is as follows: In the complaint, it was alleged that the tugboat Bermuda was a merchant vessel, documented as such at the Port of Seattle; that, at and prior to the time of the death of George Harold Meagher, the vessel was owned and operated by the defendant on the waters of Elliott bay and Puget sound; that, on or about April 20, 1930, the defendant employed George Harold Meagher as a seaman on the Bermuda; that he went on board that day, and commenced and thereafter continued in such employment until the 11th day of May, 1930, when he came to his death by reason of the negligent and wrongful acts of the defendant.

It was further alleged that the Bermuda was equipped with a compressed air engine for compressing air and storing it in tanks; that this engine was connected with pipe lines to two cylindrical metal storage tanks; and that the compressed air in the storage tanks was used in the operation of the vessel.

That one of the storage tanks was suspended from the ceiling of the engine room at the after end and attached to the engine room thwartship bulkhead; and that, thus situated, the air tank was readily accessible to fire or heat; whereas, if the tank had been placed in the hold of the vessel down in the bilge or over the keel, it would not have been exposed to fire or heat. That the tank could have readily been so placed, but that the actual location of it, with respect to the engine room, was such that it greatly increased the danger of tank explosion, all of which defendant well knew, or

in the exercise of due care should have known, when it located and installed the tank.

It was further alleged that the tanks were not equipped with release or escape valves, or any other device which would automatically permit the compressed air to readily and freely escape, so as to reduce the air pressure within the tank in the event the pressure should become too great for the strength and capacity of the tank; that suitable and sufficient escape, release, or vent valves or other device for use upon the compressed air tanks could have been readily and easily obtained and installed for the purpose of relieving the tanks from excessive air pressure. That the absence of such release or escape valves, or other devices for the release of excessive pressure, rendered the vessel dangerous and unsafe to those on board.

Plaintiff further alleged that the tank which exploded was made of light sheet metal, and that the ends of it were welded to the sides thereof; whereas they could easily and readily have been riveted, and should have been riveted, to the main tank body; and that, so constructed without riveting, the tanks were weak, defective and unfit for the storage of compressed air.

Plaintiff further alleged that the installation and location of the air tank which exploded, when considered and taken in connection with the absence of release or escape valves, and the faulty and defective tank construction, combined to create a trap, hazard and place of great danger for those employed on board the vessel; that defendant knew of the highly dangerous and defective and insufficient condition of the vessel in the particulars mentioned, or in the exercise of due care should have known of it; and it was further alleged that, on May 10, the tug stranded on the coast of Elliott bay, and remained aground until two o'clock A. M. on May 11, when she caught fire and burned until

the flames were extinguished by the fire department of the city of Seattle.

That George Harold Meagher was on board the vessel when the fire broke out; that he went on shore and called for aid; and that, while so engaged, defendant's tug, C. C. Cherry, came to the aid of the stranded Bermuda; that Meagher paddled out to the Cherry in a row boat to report the fire in the Bermuda's engine room.

It was further alleged that one G. S. Atwood at that time was, and for a long time had been, secretary of the defendant corporation, and then and there had full charge of the operation and management of the vessels and employees of the defendant corporation; that, when Meagher came to the C. C. Cherry, Atwood, who was on board the Cherry, ordered Meagher to return to the Bermuda and to throw water on the fire. That, pursuant to such order, Meagher returned to the Bermuda and commenced to throw water upon the fire; and that, while thus engaged, the air tank hereinbefore described exploded, causing the death of Meagher.

In paragraph XII of the complaint, it was alleged:

"That the death of plaintiff's intestate was due solely to the wrongful and negligent acts of the defendant in the following particulars, viz:

"(a) That defendant then and there failed to provide and furnish plaintiff's intestate with a safe place to work as hereinabove particularly set forth.

"(b) That defendant's vessel Bermuda was then and there dangerous and unseaworthy.

"(c) That the said tank hereinbefore referred to was insufficient, dangerous and defective in the particulars enumerated, and defendant, in ordering plaintiff to go on board said vessel in the condition then existing, was guilty of gross and wanton negligence.

"(d) That defendant, in the exercise of due care, should have known that a tank placed on said vessel

in the manner aforesaid, constructed and installed as aforesaid, would be likely to explode upon said burning vessel.''

In its answer, the defendant admitted its corporate existence and its ownership and operation of the Bermuda. It admitted that Meagher was employed on the vessel from April 20 to May 11, the date of his death. It admitted that the Bermuda was equipped with two certain tanks intended for the storage of compressed air, and admitted that one of the tanks was suspended at or near the ceiling at the after end of the engine room, as alleged in the complaint.

It is admitted that one of the tanks exploded on the morning of May 11, and that the ends of the tank were welded to the sides thereof. It admitted that the vessel was stranded on May 10, and remained so until the morning of May 11, at which time it caught fire; and admitted that George Harold Meagher was aboard when the fire broke out, that the defendant's tugboat C. C. Cherry went to the aid of the Bermuda, and that George Harold Meagher went out to the C. C. Cherry in a small boat. It admitted that Meagher returned to the Bermuda and threw water on the fire; and that, while Meagher was so employed, an air tank exploded that resulted in his death. The age of the deceased was admitted, and it was admitted that Bernard B. Meagher and Harriet M. Meagher were husband and wife, and father and mother of the deceased.

Other allegations of the complaint, including the allegation of damages and the allegations contained in paragraph XII, were denied. By way of affirmative defense, it was alleged, first, that the death of Meagher was caused by his own negligence; and second, that the deceased was master of the vessel, thoroughly familiar with her construction and equipment, and that

he assumed all risks incidental to employment aboard the vessel.

By a reply, the plaintiff joined issue on the affirmative defenses.

One of the principal arguments on behalf of the appellant involves seven separate assignments of error, including the denial of its challenge to the sufficiency of the evidence to warrant any verdict or judgment for the plaintiff, the challenge being made in several ways at the trial, and argued here in connection with the alleged negligence of the appellant and the affirmative defenses of contributory negligence and assumption of risk charged against the deceased.

There was a conflict in the evidence upon many material facts in these respects, but there was substantial evidence the jury was at liberty to believe, about as follows: The deceased was a boy of limited experience at steamboating, without a navigator's or master's license. Only he and one Bowen were on the vessel making the voyage. He was navigating the boat, Bowen being asleep when the vessel stranded. The vessel rested on her side on a large rock high up on the beach. Meagher reported the matter to Atwood, who was the secretary and one of the managers of the appellant, who finally arranged, as Meagher and Bowen knew, to take the tug C. C. Cherry and her crew of four men to the rescue of the Bermuda at high tide about two o'clock A. M., May 11.

Meagher was away from the vessel much of the time on May 10, and upon returning just before the fire, he found her with her lights out. Knowing her side was injured from lying on the rocks, he decided to see if water was coming in; and although he asked Bowen, who was abed on the vessel, for a flash light, he, without waiting to get the light, struck a match which, in some manner, set the vessel on fire.

Meagher and Bowen were unable to subdue the fire. Bowen got out on the beach and procured another to call the fire department. Meagher, noticing the C. C. Cherry coming in at that time, took a row boat from the Bermuda, and by the use of a pike pole as a double paddle, went out to the C. C. Cherry to report the fire on the Bermuda.

He rowed along side the Cherry, standing out from one hundred fifty to several hundred feet as different witnesses estimated, and engaged in conversation with Atwood and the captain and first mate of the Cherry. The parties were all excited, and one person on the Cherry, probably the captain, engaged in loud profane talk to Meagher. Atwood's voice was heard by Bowen on the beach, he being used to it, and although he could not give Atwood's language, said its tone was that of command and order. Meagher was told by, or in the presence of, Atwood not to let the fire department put out the fire; that they, the crew, would come over and help him put it out.

Some one gave Meagher a bucket and he left to go back to the fire. Upon arriving there, he was noticed to be agitated and crying as he got on the edge of the deck of the Bermuda, at which time he threw one or more buckets of water into the burning engine room of the vessel, causing one of the air tanks to explode, knocking him into the water, from which he was taken dead a few minutes later. In the meantime, the captain and first mate of the Cherry lowered a row boat belonging to that vessel and followed Meagher to help put out the fire. They were close by when the explosion occurred.

 Though contradicted, there was very substantial evidence of the unsafe manner of the construction and installation of the apparatus, equipment and machinery in the Bermuda, as alleged in the complaint,

as bearing upon the explosion that occurred and the cause of it, which installation, it was shown, was known to the superior officers of the appellant. This testimony, with other testimony to the effect that Atwood ordered Meagher to return to the Bermuda to put out the fire—of which more will be said later—together with further testimony that Meagher was a boy with limited experience about such vessels, and that it was his going back to the fire where the explosion occurred, together with the explosion, that constituted the last steps in the cause of Meagher's death, made the case one for the jury upon all three questions, viz: the negligence and wrongful acts of the appellant, the contributory negligence and the assumption of risk on the part of the decedent.

But appellant says that Meagher was not given any order to return to the Bermuda to put out the fire. The testimony shows that Atwood went on the Cherry with its Captain Nelson, its mate Berg and other members of the crew. Atwood testified that he sent the Cherry because he had more confidence in Captain Nelson than any one else, as being able to handle the situation. He further testified that, when Meagher reached the Cherry, he, Meagher, told Atwood how the fire started, and when Meagher left the Cherry, Captain Nelson said they would get their boat and go over with Meagher, and that, after they went for the boat, Atwood said, "I will go with you, Harold."

He further testified as follows: "The matter of putting the fire out was discussed in a general way," and that he said to Meagher: "Well, we will go and see what we can do and I will go with you." He testified that he, himself, was excited. He did not go in the row boat with Nelson and Berg, who closely followed Meagher.

Nelson testified that he swore at Meagher upon the

latter reaching the Cherry, and that he carried fire extinguishers on his row boat, as it was safer and larger than the boat Meagher was using.

Berg testified that he or Nelson gave Meagher the bucket from the Cherry; that they were within sixty or seventy feet of the Bermuda when the explosion occurred; that they could not see Meagher; and that they then looked in the water for him, after which they went upon the beach.

Williams, the cook on the Cherry, testified that, when the bucket was given to Meagher, Atwood said to Meagher: "Go ahead and try to put the fire out," and that Nelson then broke in and said: "We will be with you in a minute."

A witness, living near the scene of the burning vessel, testified that he saw Meagher's body blown into the water; saw Cecil Bowen at that time; that Bowen was grief stricken and terribly upset then and all the rest of the evening, nearly distracted; after the explosion, the two men that rowed from the Cherry seemed to be looking around in the water, and then went on shore; saw Cecil Bowen approach them; would say it was about seven or eight minutes after the explosion; and saw Cecil Bowen go over to talk to the two men.

Cecil Bowen testified that he recognized Atwood's voice when Meagher went out to the Cherry, having heard him issue orders before. That Atwood said: "Do not let the fire department put out the fire, that they could put it out with buckets." That, after the explosion, he talked with Nelson and Berg, who came out from the Cherry. It could not have been over three or four minutes after the explosion that he asked Berg why they let Harold Meagher go back, and that he said, "Atwood sent him back." At the time of the conversation with Berg, the body of Harold Meagher had not been found, and the fire had not been put out.

The harbor patrol boat was dragging for the body at that time. He further testified that Harold Meagher was crying when he went aboard the Bermuda, after leaving the Cherry.

This testimony was sufficient to take to the jury the question of whether Meagher was ordered by Atwood, a superior, back to the fire to throw water on it.

██ It is contended that the testimony of Bowen that, in answer to a question, Berg said that Atwood ordered Meagher back to the burning vessel, was improper, not a part of the *res gestae* and was prejudicial. It would be difficult to decide upon anything more natural and spontaneous than just that question at that time, and the answer given. It happened a few minutes after the order was given, between employees of the same master, concerning and within a few minutes of the tragic death of another employee, and at a moment parties were dragging and looking into the water to recover the body of the injured person, everybody being excited at the time. The question and answer, manifestly devoid of any preconceived plan or purpose, constituted a fact that happened among those who in a business way were upon the scene of and connected with the fatal transaction. Necessarily, it was a voluntary act, incidental to the litigated fact or controversy of why Meagher went or was ordered back to the fire and threw water on it, causing the explosion which just at that moment had blown him into the water. This evidence was proper under the *res gestae* rule.

██ But aside from this consideration, if it should be admitted that the testimony was technically incorrect, still it could not be held to be prejudicial or reversible because of the abundance of other proof properly admitted that Atwood did give the order—such proof consisting, in part, of admissions by Atwood him-

self on the witness stand of such sort that no other reasonable inference can fairly be drawn from the admissions than that he gave such order.

In two other assignments, complaint is made that respondent's counsel were allowed, over objections, to cross-examine respondent's witness. This was done, it appears, upon a showing, at the time, of hostility or aversion on the part of the witness and surprise to counsel caused by answers at variance with information the witness had formerly given. Such matters are within the discretion of the trial judge, of which there was no abuse in this case.

Fifteen other assignments of error, argued together by counsel, rest upon the admission over objections of testimony tending to show defective and unseaworthy conditions in the Bermuda in several respects claimed by appellant to be outside the scope of the complaint, such as that gasoline for the auxiliary engine was carried in five-gallon containers instead of a permanent tank; that the air tank had a plug in it; and that there was one check-valve too many between the shut-off valve and the compressor head, and in other respects that need not be specified. These assignments also involve the refusal of the court to strike such testimony, and also the giving of one instruction and refusal to give one requested, with reference to these matters. Assignments eight and nine, though not referred to by number in appellant's discussion in its brief, are discussed in substance in connection with the fifteen assignments just referred to.

With reference to all these assignments, it appears that, after the case was assigned for trial, respondent tendered an amended complaint showing somewhat more in detail at least some of the defective conditions of the vessel. Over the objections of appellant to the filing of the amended complaint, the presiding judge

of the superior court held that the amendments would be allowed on condition that the assignment of the case for trial should be stricken, and gave respondent limited time to decide. Respondent chose to stand on the original complaint rather than have a continuance.

The argument of appellant appears to be that, because respondent elected to stand on the complaint rather than amend on the conditions named, it amounted in a way to a construction of the complaint that would not allow the testimony admitted over objections at the trial. But the argument is not conclusive. For the purpose of the trial, the scope or construction of the pleading was, of course, left finally to the judge who tried the case. In full, the complaint in its specific and general allegations appears to be comprehensive. No motion was interposed to have it made more definite and certain in any particular, notwithstanding the separate general allegation, "(b) That defendant's vessel Bermuda was then and there dangerous and unseaworthy."

"In the construction of a pleading, for the purpose of determining its effect, its allegations shall be liberally construed, with a view to substantial justice between the parties." Rem. Comp. Stat., § 285.

A separate discussion of each of these fifteen assignments we think is unnecessary. They refer to testimony fairly within a reasonable construction of the allegations of the complaint.

Another assignment is that the court erred in refusing to withdraw from the consideration of the jury two allegations of negligence mentioned in the complaint upon which it is claimed there was no proof, viz: that the tank which exploded was improperly located in the engine room, and that it was insufficient because it was welded instead of riveted. Appellant

is in error in this respect. There was testimony upon both points.

One of appellant's expert witnesses testified concerning the sufficiency and safety of a welded tank; and, notwithstanding an assignment of error, it was competent on cross-examination, as affecting the value of his testimony, to ask him about an explosion near that time, within his information, of a welded tank on another vessel in the harbor.

The giving of instruction number nine upon the law of the duty of an employee to obey the orders of his employer in the absence of manifest danger, as the same would appear to a prudent man exercising due caution, etc., is assigned as error because, as it is claimed, there was no competent proof that any such order was given. This has reference to the order spoken of, given by Atwood to Meagher. But, as already seen, there was evidence to satisfy the jury that such order was given.

The refusal to give requested instructions numbers eight, eleven and twelve, constitute assignments of error discussed together. They relate to the duty of the master to furnish a reasonably safe place for his employee to work, including the kind of appliance to be furnished, and that the employer is not an insurer of its absolute safety. These matters, considering the evidence in the case, were reasonably and sufficiently covered by instructions that were given.

Affirmed.

TOLMAN, C. J., HERMAN, and PARKER, JJ., concur.